1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                FOR THE EASTERN DISTRICT OF CALIFORNIA

10   CARRY JOE VANG,

11              Petitioner,                No. CIV-F-03-5528 ALA HC

12        vs.

13   D.L. RUNNELS, Warden,

14              Respondent.              <u>ORDER</u>

15   _____/

16            The Petitioner is proceeding *pro se* with an application for writ of habeas corpus

17   under 28 U.S.C. § 2254.  In 1998, the Petitioner was convicted in the Superior Court of Fresno

18   County of one count of murder, eleven counts of attempted murder, one count of vehicle theft

19   and one count of street terrorism.  He was sentenced to 25 years to life and nine consecutive life

20   terms.  The Petitioner also received an aggregate determination term of 59 years as a result of

21   various enhancements.

22                              **I**

23            On direct appeal, the California Court of Appeal summarized the facts underlying

24   the Petitioner's conviction and sentence as follows:

25            The charges and allegations arise from two separate gang-related
             retaliatory drive-by shootings committed within several minutes of
26           each other, which resulted in the death of a three-year-old girl and

                              1

the wounding of three others.

**The shootings**

Between 4:45 p.m. and about 7:30 p.m. on August 21, 1996, Javier Hidalgo's 1993 maroon-colored, four-door Toyota Camry was stolen from his apartment complex on North Fresno Street.

Around 9:30 p.m. that evening, May Moua observed a car pull up in front of her duplex unit located on East Washington, and alerted her husband, Chang Her. Her opened the front door to get a better look. As he stood at the open doorway with his daughter, Gaohoun, standing by his side, multiple gunfire immediately came from the vehicle. The car was a Japanese-make four-door, and its color was maroon or burgundy. It traveled eastbound on East Washington, made a U-turn, and fired a second volley of shots toward the duplex. There were two or more people in the vehicle, and someone appeared to be sitting in the rear passenger window firing over the top of the car.

Twenty-one shell casings from an AK series assault rifle and five shotgun shells were found at the scene. At least 50 bullet holes dotted the front of the duplex, with the majority focussed [sic] on Chang Her's unit. "In fact, there was so much gunfire damage, it was hard to follow each and every hole." The damage spanned a distance of 25 feet, ranging from three inches to six and one-half feet above ground. There was also extensive gunfire damage throughout each unit's interior.

Chang Her's daughter, Gaohoun (count 1), suffered fatal gunshot wounds to the chest and abdomen. May Moua (count 2) received multiple gunshot wounds requiring her to terminate her pregnancy and, by stipulation, caused "great bodily injury." Neither Chang Her (count 4), nor the two other children present, Kalia (count 3) and Andy (count 5), were injured.

A few minutes later and only blocks away, the same high-powered assault rifle was used to spray bullets at an apartment on East University, occupied by the Fang family. Mother Mee Fang (count 10), her son Touhar (count 7), and her daughter Pang, (count 11) were watching television by the front window with the lights on. Two other children, Louise (count 8) and Yee (count 9), were watching television in the bedroom. Touhar suffered multiple gunshot wounds and lost the use of his right elbow. Mee was shot in the chest and abdomen, and has suffered mental and physical problems since. None of the other children were injured despite extensive damage to the residence.

One or two people were seen shooting from the grassy area in front

2

of the apartments while backing toward a maroon car stopped nearby. They then got into the car, which sped off with its lights off. Three teenage Asian males were seen in the car.

Around midnight Leanne Moreno saw a burgundy four-door Toyota Camry stop across the street from her house, followed by an orange or brown sedan with two occupants. Three Asian male teenagers appeared nervous as they got out of the Camry and entered the second car. One appeared to wipe fingerprints off the Camry's exterior. All five left in the second car.

**Gang evidence**

In August 1996, Men or Menace of Destruction (MOD) and Oriental Ruthless Boys (ORB) were rival Hmong street-gangs in Fresno with intense animosity between them, and a history of violent conflict. In the street-gang culture, any insult or slight may justify a retaliatory response. A failure to retaliate leads to a loss of respect, power or manhood, both within and among gangs, and invites further attacks.

Defendant Vang, age 16, and defendant Yang (aka Gak), age 17, had MOD tattoos and were active MOD members.[1]  In his bedroom, defendant Yang had a mirror with MOD written on it, along with his notebook and a letter he drafted with various MOD scribbling. He also had a photo album containing numerous photos of defendants with known MOD gang members and/or associates, wearing MOD colors, displaying MOD tattoos, and making MOD gang signs with their hands. Defendant Yang was apparently trying to break away from the MOD gang at the time of the shootings.

Defendant Lao (aka Koolaid), age 17, associated with MOD but was not a member. He did not have a MOD tattoo. A gang "associate" is someone who hangs out with the gang but is not a member because he has not been initiated by being "jumped in." According to Asian gang expert Ramon Gines of the Fresno Police Department, defendant Lao qualified as a member of MOD based on police department criteria. This included defendant Lao's presence in photographs with documented MOD members, and Lao's correspondence with MOD members. The MOD typically would not bring along a non-member to commit a serious crime, but if he had a long-standing relationship of trust with the gang, then they might involve him.

Chang Her did not belong to any gang. However, his friend and

---

[1] The parties stipulated that MOD is a criminal street-gang within the meaning of section 186.22, subdivisions (e) and (f).

neighbor, Za Xiong, was an ORB gang member. Xiong had moved from the adjoining duplex unit on East Washington two weeks before the shooting. Shortly before Xiong moved out, ORB members, including Touhar Fang, had frequented Xiong's residence for protective reasons because one month earlier Xiong had assaulted a rival MOD gang member.

Two to three months before the shootings, Touhar was accosted by a carload of MOD gang members, including defendants Vang and Yang, outside a restaurant near his apartment. The incident occurred while Touhar was walking to the restaurant. After ignoring inquiries of whether Touhar belonged to a gang, defendant Vang and four others exited a brown car and Vang struck Touhar in the face when Touhar denied belonging to a gang. Defendant Yang stood nearby and appeared to have a weapon under his shirt. The group then left in the car, and Touhar walked to his apartment. A short while later, the car returned and stopped near Touhar's apartment. Following the incident, Touhar identified defendant Yang from a photograph.

On August 14, 1996, shots were fired at the residence where defendant Vang lived with his parents and siblings. Defendant Vang had placed his bedroom furniture against the wall nearest the street and had been sleeping on the floor in order to protect himself from street gunfire.

On August 16, 1996, shots were fired at defendant Yang's house, located on North Del Mar. Defendant Yang told police he thought the ORB gang was responsible for the shooting in retaliation for an assault he committed on one of its members.

On August 20, 1996, defendant Vang's family was robbed and assaulted at gunpoint in their home by a group of Hmong males. Defendant Vang was not home at the time. Defendant Vang's father told police his son's enemies, who wanted to kill him, perpetrated the attacks. Defendants Vang and Yang believed the ORB gang was responsible. Based on these incidents, Detective Doug Stokes believed defendants Vang and Yang had personal motives to commit the crimes on August 21, 1996.

**The investigation**

The police determined the Toyota Camry left in front of Leanne Moreno's house was stolen, and that it was involved in the drive-by shootings of August 21, 1996. A plastic bag and receipt from Walgreens Drug Store were found on the right front floorboard. The receipt indicated a pair of thick latex gloves and a ten-pack of thinner gloves were purchased at Walgreens near Cedar and Olive in Fresno on August 21, 1996, at 8:33 p.m., one hour before the

4

shootings. A latex glove was found under the driver's seat.

Defendant Lao's fingerprints were found on the Walgreen's bag and inside rearview mirror. Defendant Vang's fingerprints were found on the Walgreen's receipt. Defendant Yang's fingerprints were found on the inside rearview mirror and the exterior of the car. It appeared someone had attempted to wipe down the front exterior of the car.

Two expended shell casings similar to those found at the shooting scenes and a live .25 caliber round were found on the rear passenger floorboard. Ballistics testing revealed that all the expended shell casings recovered were fired from the same assault rifle. However, analysis of the live .25 caliber round was inconclusive.

Defendant Yang was arrested on September 17, 1996, at Yee Yang's residence. When police arrived, defendant Yang went into the room of Yee Yang's sister and hid a loaded .25 caliber semiautomatic handgun in her purse in the closet. Yee Yang (aka Handy), a former MOD member who frequently hung out with defendants, was arrested on Youth Authority parole violations.

On August 21, 1996, at about 11 p.m., Yee Yang received a telephone call from defendant Vang telling him to pick him up at Ko Vang's (aka Tiger) apartment. Defendant Vang sounded nervous, and told Yee Yang he needed to get rid of a car. About 35 minutes later, Yee Yang arrived at the parking lot of Ko Vang's apartment complex, where defendants Vang and Lao were standing by a maroon Camry. Defendant Lao joined Yee Yang in his red/orange Toyota Tercel, and they followed defendant Vang, who was driving the Camry, to a nearby residential neighborhood. Defendant Vang wiped down certain areas inside and outside the Camry before getting into Yee Yang's car. Yee Yang then drove defendants Lao and Vang back to Ko Vang's apartment and went home. Defendants Vang and Lao were nervous because they were dumping a stolen vehicle. Sometime later, the four discussed exercising caution because they had just done a drive-by, and to watch for retaliation by the ORB gang.

In July 1997, after he provided information to the police, Yee Yang was given $300 by police to speak to the police academy about gangs. He was never considered a suspect in the shootings because he had an alibi and was not placed at any of the crime scenes. Although he was initially informed that he could be charged as an accessory to murder after the fact, he was never charged and no law enforcement personnel or prosecutor made a deal with him in exchange for his testimony.

At least three other people told police that defendant Lao was at Ko Vang's apartment complex during the time of the shootings. However, police did not attribute much veracity to the statements because they were made by fellow MOD members or associates, and because the times given were inconsistent, and even if true, still allowed defendant Lao time to commit the crimes.

**Evidence of admissions**

In October or November 1996, while incarcerated in Juvenile Hall, defendant Vang told Voua Yang, a member of another Asian streetgang, that he was in for murder. When Yang asked what kind of murder, defendant Vang stated that he "got some" ORBs. Defendant Vang also admitted shooting the wrong house by mistake; he was trying to get an ORB member named "Za" and his friends, but they had apparently moved.

When police interrogated defendant Lao, he initially denied involvement in the shootings. He claimed he had been swimming at Ko Vang's apartment complex since before dark until about 10 p.m., and first learned of the shootings on the evening news. Police suspected defendant Lao was the driver of the Camry and explained to him that under the felony murder rule, he could be held responsible for murder of the young child. He responded, "I didn't shoot." Several times while Detective Stokes explained the felony-murder rule, defendant Lao stated, "I'm not the shooter. I'm not the shooter." Defendant Lao also said that it was wrong for two people to be responsible for a shooting if one person did not shoot, stating, "American courts suck. It's wrong."

When police interrogated defendant Yang on September 17, 1996, he admitted he was a member of MOD but denied any involvement. The circumstances of his interrogation are detailed later.

Following their arrests, defendants Vang and Lao wrote incriminating letters to various people. Two of defendant Lao's letters suggested an alibi for him on the night in question. One of defendant Vang's letters implored the addressee not to cooperate with police. Another of his letters acknowledged it was a hit against ORB that was successful against one member and his mother. In the other they injured "this one bitch and her daughter was the one that passed away." Defendant Vang also urged further retaliation for what was done to his family, "So that's why I had asked you to funks them O.R.B.'s up for me." He also stated, "I want you to really handle them O.R.B. fools good." He also acknowledged, "I was by myself out here I did hella shit and it was mostly me and-but mostly I ran the shit. If I wanted something done I did it myself unless the [MOD] wants to help...."

1

2

3      **Defense**

4      The only defense evidence presented was by defendant Lao. His
       evidence was that, on September 17, 1997, a defense investigator
5      went to apartments on West Ashlan. The investigator went to
       apartment 128 to conduct an interview with Ko Vang, who came
6      out of that apartment. However, the investigator was unable to
       complete the interview.

7

8  *People v. Vang*, 104 Cal. Rptr. 2d 704, 706-11 (Ct. App. 2001).

9  The California Court of Appeal for the Fifth Appellate District reversed the judgment as to one

10 count of attempted murder and remanded for a limited rehearing on a motion for a new trial

11 based on the sufficiency of the evidence requiring that the trial court conduct its own

12 independent review of the record based on the 13th juror standard. *Id.* at 711; *see also* Answer,

13 Ex. C at 48-49.[2]  It affirmed the Petitioner's conviction and sentence in all other respects.

14 Answer, Ex. C at 55.  The Petitioner sought review before the California Supreme Court.  It

15 denied the Petitioner's request without comment.

16                                    **II**

17          Federal habeas corpus relief is not available for any claim decided on the merits

18 by a state court unless its adjudication of the claim:

19          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established Federal law, as
20          determined by the Supreme Court of the United States; or

21          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
22          State court proceeding.

23 28 U.S.C. § 2254(d).

24
_____

25      [2] In its answer, Respondent included a copy of the California Court of Appeal opinion.
Because part of the opinion is unpublished, this Court cites to Exhibit C of the Answer when
26 referencing the unpublished portion of the opinion.

1

2         Under section 2254(d)(1), a state court decision is "contrary to" clearly

3 established United States Supreme Court precedents if its decision contradicts the governing law

4 set forth in a Supreme Court decision, or if it confronts a set of facts that are materially

5 indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different

6 result. *Early v. Packer*, 537 U.S. 3, 8 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406

7 (2000)).

8         Under section 2254(d)(1), a federal court may grant an application for a writ of

9 habeas corpus if the state court identifies the correct governing legal principle from the Supreme

10 Court's decisions, but unreasonably applies it to the facts of the case. *Williams*, 529 U.S. at 413.

11 A federal habeas court, however, "may not issue the writ simply because that court concludes in

12 its independent judgment that the relevant state-court decision applied clearly established federal

13 law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 412;

14 *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas

15 court, in its independent review of the legal question, is left with a 'firm conviction' that the state

16 court was 'erroneous.'")

17         A federal court looks to the last reasoned state court decision as the basis for the

18 state court judgment. *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v.*

19 *Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Where the state court reaches a decision on the

20 merits, but provides no reasoning to support its conclusion, a federal court must independently

21 review the record to determine whether habeas corpus relief is available under section 2254(d).

22 *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 982

23 (9th Cir. 2000).  Here, this court will review the California Court of Appeal's decision as the last

24 reasoned state court opinion.

25                                **III**

26         The Petitioner claims that there was insufficient evidence to support his attempted

murder convictions on counts 2, 3, 5, and 8-11.  He appears to maintain that the evidence does not demonstrate that he had the specific intent to kill May Moua (count 2), Kalia Her (count 3), Chang Her (count 4), Andy Her (count 5), Louise Fang (count 8), Yee Fang (count 9), Mee Fang (count 10), and Pang Fang (count 11), the individuals who were injured by bullets that hit other parts of the buildings due to the movement of the car.  Petition at 19.  He asserts that, at most, his actions demonstrate deliberate indifference, which falls short of the state of mind required to support an attempted murder conviction.  *Id.* at 20.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable  doubt.'"  *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).   A petitioner in a federal habeas corpus proceeding "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the habeas court must find that the decision of the state court reflected an objectively unreasonable application of *Jackson* and *Winship* to the facts of the case. *Id.* at 1275.

When the sufficiency of the evidence is challenged by a state prisoner in federal habeas corpus proceedings, a federal court must review the entire record.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987); *see also Jackson*,443 U.S. at 318 (implying that in federal

9

1

2   habeas corpus proceedings, federal courts have a duty to review the underlying facts for an

3   insufficiency of the evidence claim as they do for claims relating to an alleged involuntary

4   confession).  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

5   evidence, and to draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443

6   U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the

7   reviewing court will assign the inference that favors conviction.  *McMillan v. Gomez*, 19 F.3d

8   465, 469 (9th Cir. 1994).  "The relevant inquiry is not whether the evidence excludes every

9   hypothesis except guilt, but whether the jury could reasonably arrive at its verdict."  *United*

10  *States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994) (quoting *United States v. Mares*, 940 F.2d

11  455, 458 (9th Cir. 1991)).  A federal court must determine the sufficiency of the evidence in

12  reference to the substantive elements of the criminal offense as defined by state law.  *Jackson*,

13  443 U.S. at 324 n.16; *Chein*, 373 F.3d at 983.

14          In Mr. Vang's direct appeal, the California Court of Appeal rejected his claim and

15  concluded that substantial evidence supported his convictions for attempted murder in counts 2,

16  3, 5, 6, and 8-11.[3]  *Vang*, 104 Cal. Rptr. 2d at 711.  It held that the doctrine of transferred intent

17  was applicable to the Petitioner's case.  It reasoned as follows: "The doctrine of transferred

18  intent connotes a policy.  'Contrary to what its name implies, [it] does not refer to any actual

19  intent that is "used up" once it has been employed to convict a defendant of a specific intent

20  crime against an intended victim.'"  *Id.* (citing *People v. Scott,* 927 P.2d 288, 289 (Cal. 1996)).

21  The court stated "[t]he jury drew a reasonable inference, in light of the placement of the shots,

22  number of shots, and the use of high-powered, wall-piercing weapons, that defendants harbored

23  a specific intent to kill every living being within the residence they shot up."  *Id.* at 710 (citing

24  ───────────────

25          [3] The Court of Appeal reversed the Petitioner's conviction on count 12 for attempted
    murder because there was no evidence presented that the Petitioner intended to kill an unnamed
26  rival gang member.

*People v. Herrera*, 83 Cal. Rptr. 2d 307, 310-312 (Ct. App. 1999)).  Respondent argues that "[t]his conclusion is bolstered by the testimony regarding retaliation," which "support[s] an inference that the Petitioner harbored a specific intent to kill relatives of rival gang members who he and a co-defendant believed were residing in the homes they targeted."  Answer at 14.

The record demonstrates that substantial evidence supported the California Court of Appeal's conclusion that the Petitioner had the required state of mind to convict him of the attempted murder counts.  For example, Officer Fred W. Weiss testified on direct examination in detail about the bullet holes and casings he found in virtually every room of an apartment at one of the shootings.  *See, e.g.,* RT at 1017-19 (describing the four to six bullet holes and strike marks that were in a bathroom, closet, and bedroom that traversed through numerous walls); *id.* at 1020-23 (describing in detail the twelve bullet holes and strike marks he observed in the front window and the wall surrounding the window).  Officer Douglas Ray Stokes testified that several vehicles were hit by rounds of bullets and that numerous rounds were fired at the front of the residence.  *Id.* at 361.  He stated that the rounds went through the living room into the kitchen and that the patterns on the doors and walls indicated shotgun blasts.  *Id.*; *see also id.* at 324-28 (identification technician Christina Stirling testified that the bullet damage continued to the rear exterior of the apartment and that 13 bullet fragments, 20 shotgun pellets, and one fully intact bullet were found at the location).  After examining 39 cartridge cases discharged at the shooting sites, one of the weapons used was identified as an AK-47 semi- or fully-automatic assault weapon.  *Id.* at 301.

There is also overwhelming evidence of the Petitioner's participation in the shooting, and evidence that the shooting was retaliatory and gang-related, a fact from which

1
2   intent can reasonably be inferred.[4]  For example, testimony offered by the state at trial showed

3   that the Petitioner admitted his involvement in the shootings to another inmate while in custody.

4   RT at 1073.  The record shows that the Petitioner stated that he "shot at [the] wrong house" and

5   that he "meant to shoot at guy named Za."[5]  *Id.*  The Petitioner's father testified regarding attacks

6   on his family by rival gang members.  He stated that someone entering his home and physically

7   assaulted him and other family members the day before the two drive-by shootings occurred.  *Id.*

8   at 1100-02.  This testimony demonstrates that the Petitioner had a motive to retaliate against the

9   rival gang.  This evidence supports the state's argument that the Petitioner was involved in the

10   shootings.  In addition, the record shows that the Petitioner had MOD tattoos and photographs

11   flashing gang signs, which are  indicative of his gang membership, and the Petitioner admitted to

12   being a member of MOD.  *See id.* 2137-39, 2195, 1108.

13           After independently reviewing the record, I conclude that the decision of the

14   California Court of Appeal was not "contrary to, or involved an unreasonable application of,

15   clearly established Federal law, as determined by the Supreme Court of the United States," or

16   "based on an unreasonable determination of the facts in light of the evidence presented in the

17   State court proceeding."  28 U.S.C. § 2254(d).

18                                   **IV**

19           The Petitioner further contends that because the jury instruction on transferred

20

21        [4] "Evidence of a defendant's state of mind is almost inevitably circumstantial, but

22   circumstantial evidence is as sufficient as direct evidence to support a conviction."  *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 [259 Cal.Rptr. 669, 774 P.2d 698.  Circumstantial evidence

23   that a drive-by shooting was gang-related and retaliatory in nature, that defendants cased the area of the rival gang before shooting, and fired a dozen shots was sufficient to infer the intent

24   necessary to uphold the attempted murder convictions.  *People v. Herrera,* 83 Cal. Rptr. 2d 307, 310-11 (Ct. App. 1999); *see also People v. Gutierrez,* 18 Cal. Rptr. 2d 371, 374-78 (Ct. App.

25   1993) (sustaining attempted murder conviction where defendant stalked victims believed to be rival gang members, shot at victims five times, then fled and discarded gun).

26        [5] Za is apparently a rival gang member.

1

2   intent was read too closely to the attempted murder conviction, the jury mistakenly applied a

3   transferred intent theory in convicting him on the attempted murder counts.  Petition at 20A.  He

4   argues that his Fifth and Fourteenth Amendment rights were violated because the trial court

5   erred in failing to present a clarifying instruction to the jury.  *Id.*

6          The California Court of Appeal held that the trial court's instruction on

7   transferred intent did not support the Petitioner's argument that the jury improperly applied it to

8   the attempted murder counts.  .  Answer, Ex. C at 23.  The court noted that the Petitioner failed to

9   "point to anything in the record" to support his argument, and "[t]he fact that the instruction

10  immediately preceded the instructions on attempted murder does not establish that the jury

11  misapplied the instruction."  *Id.* The court also found that the Petitioner waived any alleged

12  instructional error by failing to object or request clarifying language.  *Id.* at 24.

13         To obtain habeas corpus relief for errors in the jury charge, a petitioner must

14  show that an instruction so infected the entire trial that the resulting conviction violated due

15  process.  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  The instruction may not be judged in

16  artificial isolation, but must be considered in the context of the instructions as a whole and the

17  trial record.  *Id.*  Furthermore, even if it is determined that the instruction violated the right to

18  due process, a petitioner can only obtain relief if the instruction had a substantial influence on

19  the conviction and resulted in actual prejudice.  *Brecht v. Abrahamson*, 507 U.S. 619, 637

20  (1993); *see also Hanna v. Riveland*, 87 F.3d 1034, 1039 (9th Cir. 1996) ("On collateral review,

21  *Brecht* requires a court to determine whether the constitutional error 'had substantial and

22  injurious effect or influence in determining the jury's verdict.'") (citation omitted) (internal

23  quotation marks omitted).  "The burden of demonstrating that an erroneous instruction was so

24  prejudicial that it will support a collateral attack on the constitutional validity of  a state court's

25  judgment is even greater than the showing required to establish plain error on direct appeal."

26  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (footnote omitted).

1

2     The Petitioner has failed to sustain his burden of proof on this claim.  He has not

3     shown that the jury instruction on transferred intent has "so infected the entire trial that the

4     resulting conviction violates due process."  *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  The

5     order that the jury instructions were read to the jury was appropriate.  The instruction preceding

6     the transferred intent instruction addresses the difference between murder and manslaughter.  RT

7     at 1033.  It states that "[t]he distinction between murder . . . and manslaughter is that murder . . .

8     requires malice . . ." and "[t]o establish that a killing is murder . . . and not manslaughter, the

9     burden is on the People to prove beyond a reasonable doubt each of the elements of murder . . .

10    ."  *Id.*  The transferred intent jury instruction followed the murder instruction and applies only to

11    an actual homicide.  It reads: "When one attempts to kill a certain person, but by mistake or

12    inadvertence *kills* another person, the crime, if any, so committed is the same as though the

13    person originally intended to be killed, had been killed."  *Id.* at 1034 (emphasis added).  The

14    instruction following the transferred intent instruction follows the murder instructions and

15    applies only to an actual homicide.  It explicitly states that the defendant must have "harbored

16    express malice aforethought, namely, a specific intent to kill . . . ."  *Id*. at 1035.  The instructions

17    received as a whole set forth the requirements of both murder and attempted murder.  They

18    properly instructed the jury that the transferred intent instruction applied solely to the murder

19    count.  The California Court of Appeal correctly stated "nothing in the instruction indicates that

20    the specific intent to kill a certain person could be transferred to another person who was not

21    killed."  Answer, Ex. C at 23.

22            To the extent that the Petitioner's argument rests on an assumption that the jurors

23    were not likely to pay full attention to or understand the limits on the transferred intent

24    instruction because of the placement of the instructions, it fails in light of the well-settled

25    principle that jurors listen to and comply with the trial court's instructions.  *See, e.g., Shannon v.*

26    *United States*, 512 U.S. 573, 585  (1994) (stating that there is "'the almost invariable assumption

14

1

2  of the law that jurors follow their instructions.'") (citation omitted) .

3                                         **V**

4           The Petitioner also contends that his due process rights were violated because the

5  trial court improperly denied his motion to bifurcate the trial of the "criminal gang"[6] charge and

6  gang enhancements from the remainder of the charges for the murder and attempted murder

7  counts.  Petition at 29-30.  He states that "[t]he trial court's ruling denying bifurcation forced the

8  Petitioner's stipulation to elements of the gang enhancements . . . in order to avoid admission of

9  evidence of a pattern of criminal gang activity . . . ." *Id.* at 33.

10          In a lengthy discussion of the facts underlying this claim, the California Court of

11  Appeal held that the trial court did not abuse its discretion in this regard because "'the evidence

12  is so wound up with the evidence on the principal charges that it would not make sense to try the

13  enhancements separately.'"  Answer, Ex. C at 29 (citation omitted).  It further noted that because

14  there was no abuse of discretion in denying the motion and "defendants were not 'forced' to

15  enter into the stipulation," there was no resulting error or prejudice.  *Id.* at 30.

16          A joinder of charges, or a failure to separate the guilt from the sentencing phase

17  of a trial, violates due process only if the joinder was so prejudicial that the trial court should

18  have ordered a separate trial.  *Fuller v. Roe*, 182 F.3d 699, 703 (9th Cir. 1999), abrogated on

19  other grounds in *Slack v. McDaniel*, 529 U.S. 473 (2000).  The requisite level of prejudice is

20  reached only "if the impermissible joinder had a substantial and injurious effect or influence in

21  determining the jury's verdict."  *Sandoval v. Calderon*, 241 F.3d 765, 772 (9th Cir. 2000) (citing

22  *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir.1998)).  The admission of evidence violates due

23  process if there are no permissible inferences the jury may draw from the evidence.  *Jammal v.*

24  *Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

25  _____

26          [6] "Criminal gang" evidence is evidence that demonstrates that this group of individuals
constitute a "criminal street gang" within the meaning of CAL. PENAL CODE § 186.22(f).

                                         15

1

2        Here, evidence of gang membership was relevant to the Petitioner's motive to

3   commit the crimes.  The jury properly could have inferred from this evidence that the Petitioner

4   participated in the drive-by shootings in order to benefit the gang.  This was not a case where the

5   "joinder of counts allow[ed] evidence . . . to be introduced in a trial where the evidence would

6   otherwise be inadmissible."  *Sandoval*, 241 F.3d at 772.  The Petitioner has not shown he was

7   prejudiced by the failure to bifurcate.  The evidence of gang membership was highly probative at

8   the guilt phase of the trial.  The Ninth Circuit has concluded that evidence of gang activity is

9   admissible if used to establish something other than the character of the defendant.  *United States*

10  *v. Hankey*, 203 F.3d 1160, 1172 (9th Cir. 2000); *see also United States v. Abel*, 469 U.S. 45, 54

11  (1984) (holding that evidence of gang membership is admissible where it had probative value).

12  Gang enhancement allegations differ from certain other sentence enhancement allegations.  This

13  difference explains in large part why they are less likely to warrant a separate trial.  *See People*

14  *v. Martin* 28 Cal. Rptr. 2d 660, 663 (Ct. App. 1994) (reasoning that often the same witnesses (i.e.

15  gang members) and the same evidence used to prove the substantive counts are also relevant to

16  establish the circumstances and intent of the killing based on gang activity and gang involvement

17  and, therefore, there is less of a need to bifurcate).  In California, "[a] prior conviction allegation

18  relates to the defendant's *status* and may have no connection to the charged offense; by contrast,

19  the criminal street gang enhancement is attached to the charged offense and is, by definition,

20  inextricably intertwined with that offense."  *People v. Hernandez*, 94 P.3d 1080, 1085 (Cal.

21  2004) (emphasis in original).  The Petitioner has failed to demonstrate that the denial of his

22  motion to bifurcate violated his right to due process because he has not shown that there were

23  impermissible inferences to be drawn.

24                                              **VI**

25        The Petitioner contends that prosecutorial misconduct at trial violated his right to

26  due process.  Petition at 35-37.  Habeas corpus relief will be granted on grounds of prosecutorial

16

misconduct only when it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 171  (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Bonin v. Calderon*, 59 F.3d 815, 843 (9th Cir. 1995) (holding that habeas corpus relief only can only be granted  if the error "had substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Brecht*, 507 U.S. at 622).  To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Greer v. Miller*, 483 U.S. 756, 765 (1987) (citations omitted).  Under this standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial - i.e., that absent the alleged impropriety, the verdict probably would have been different. *Id.* at 765-66; *United States v. Weitzenhoff*, 35 F.3d 1275, 1291 (9th Cir. 1994).  The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  The standard of review is, however, a "narrow one of due process, and not the broad exercise of supervisory power." *Thompson v. Borg*, 74 F.3d 1571, 1576 (9th Cir. 1996) (citations omitted). "Improper argument does not, per se, violate a defendant's constitutional rights." *Jeffries v. Blodgett*, 5 F.3d 1180, 1191 (9th Cir. 1993).

## A

The Petitioner alleges that during cross-examination by a counsel for a co-defendant, Detective Gines testified that the three defendants were closest to being "shot-callers," or leaders in the MOD gang.  Petition at 36.  The Petitioner's motion to strike was denied. *Id.*  The Petitioner argues that this testimony incorrectly allowed the jury to conclude that he was the perpetrator of the two drive-by shootings. *Id.* at 41.

1

2          The Petitioner has failed to show that there is a reasonable probability that the

3 failure to grant his motion to strike this testimony affected the outcome of the trial.  The record

4 shows that there was independent evidence of the Petitioner's membership in the gang.  *See* RT

5 at 1108 (the Petitioner's father identified the Petitioner's MOD gang tattoo); *Id*. at 2137-39

6 (photographs of the Petitioner flashing MOD gang signs and showing off his MOD tattoo); *Id.* at

7 2195 (the Petitioner previously admitted to being a member of MOD for approximately four

8 years).  Moreover, Detective Gines conceded that there were no true leaders in the gang, which

9 was consistent with the testimony given by Yee "Handy" Yang.  *See id.* at 1522 ("Handy"

10 testified that there was no leader in the gang).  This Court agrees with the California Court of

11 Appeal that this testimony "did not necessarily implicate the defendants as the actual

12 perpetrators of the crimes charged in this case."  Answer, Ex. C at 36 (citation omitted).

13 Furthermore, because the challenged question was asked by counsel for a co-defendant, the

14 Petitioner has failed to demonstrate that the prosecutor was responsible for the production of the

15 challenged testimony.

16                                          **B**

17          During cross-examination by counsel for a co-defendant, Deputy Sheriff Connie

18 Moore read part of her report which states that co-defendant Yang was a member of the MOD

19 gang and that he admitted to previously assaulting a rival gang member.  RT at 1209-10.  The

20 Petitioner claims that this testimony contravened the trial court's decision to preclude any

21 reference to prior offenses committed by defendants and that it tended to show that it was more

22 likely that the Petitioner retaliated by committing the charged offenses, which violated his due

23 process rights.  Petition at 35, 37.

24          From the record, it is clear that there is no connection between the prosecutor's

25 direct examination of Deputy Sheriff Moore and the testimony elicited during a co-defendant's

26 cross-examination of that officer.  The Petitioner has failed to demonstrate *prosecutorial*

18

1

2  misconduct in this regard.

3                                   **C**

4          Finally, the Petitioner contends that a hypothetical posed by the prosecutor to

5  gang expert Detective Lee was improper.  Petition at 36.  Detective Lee was asked the following

6  hypothetical question:

7          Q  And -- if let's assume the following hypothetical.  If you were
           aware that the three hypothetical people that I just referred to in
8          those three separate hypotheticasl were -- if you assume, first of
           all, that two of them had been either themselves or their family
9          members had been the victims of two shooting incidents and one
           robbery and assault within a week prior to a particular date, and
10         you learned further that those three people, the two people who
           either themselves or their families had been victimized and a third
11         person whom you believed to associate with M.O.D., and further
           add to the hypothetical that the two people who had been
12         victimized or their families had stated they believed that O.R.B.
           was responsible for those assaults, and you learned then that those
13         two people as well as another person, who was associated with
           M.O.D. then committed a drive-by on a house in which the people
14         at that house were associated with O.R.B. in some fashion and
           their next-door neighbor up until several weeks before had been an
15         O.R.B. gang member, that there was a shooting at that house and
           then ten minutes later there was another shooting at another house
16         in which a resident of that house was either a member of or
           associated with O.R.B., would you have an opinion as to whether
17         those two shooting incidents were in association with the M.O.D.
           gang?

18

19  RT at 2200-01.  Detective Lee answered the hypothetical with a simple "Yes."  *Id.* at 2201.  The

20  trial court overruled the Petitioner's objection that the hypothetical was complicated and

21  replicated the facts of the current case, some of which were yet to be proven to the jury.  Petition

22  at 36-37.  The Petitioner argues that allowing this testimony violated the trial court's order that

23  evidence of prior offenses would not be admissible.  *Id.* at 41.

24          The California Court of Appeal held that the Petitioner waived his argument that

25  expert testimony on the elements necessary for proving gang enhancement was inadmissible

26  because at trial, defendants only objected to the form of the hypothetical and not its

1

2   admissibility.  Answer, Ex. C at 33 (citations omitted).  Further, the court reasoned that this

3   contention lacked merit because such evidence is admissible as it is relevant to the issue of

4   motive or intent.  *Id.*  The California Court of Appeal concluded that "[i]t is clear that the court

5   did not abuse its discretion by permitting Detective Lee to give his expert opinion based on the

6   hypothetical question since it was rooted in facts shown by the evidence."  *Id.*  The Petitioner has

7   failed to demonstrate that this hypothetical question infected the trial process with unfairness

8   and, that absent this hypothetical, the verdict would have been different.  *See Darden*, 477 U.S.

9   at 181 (holding habeas corpus relief will only be granted is the prosecutorial misconduct "so

10   infected the trial with unfairness" as to make the verdict "a denial of due process").

11                                                    **VII**

12          The Petitioner stated that he "was not afforted [sic] the effective assistance of trial

13   counsel . . . insofar that trial counsel failed to object to statements and testimony given by

14   "Handy" or Yee Yang."  Petition at 43.  "Handy" was a friend of the Petitioner's and a member

15   of the MOD gang.  RT at 1326-27, 1337.  The Petitioner argues that his attorney should have

16   objected to this testimony because Handy was bribed by police officers.  Petition at 45.  The

17   Petitioner maintains that it was Handy's testimony that the Petitioner was closely associated with

18   the co-defendants and the MODs linked him to the shootings.  *Id.* at 46.

19          Ineffective assistance of counsel claims are analyzed under the "unreasonable

20   application" prong of *Williams v. Taylor*, 529 U.S. 362  (2000).  *Weighall v. Middle*, 215 F.3d

21   1058, 1062 (9th Cir. 2000).  The Supreme Court has enunciated the standards for judging

22   ineffective assistance of counsel claims.  *See Strickland v. Washington*, 466 U.S. 668 (1984).

23   First, a defendant must show that, considering all the circumstances, counsel's performance fell

24   below an objective standard of reasonableness.  *Id.* at 688.  To this end, the defendant must

25   identify the acts or omissions that are alleged not to have been the result of reasonable

26   professional judgment.  *Id.* at 690.  The court must then determine whether in light of all the

1

2 circumstances, the identified acts or omissions were outside the wide range of professional

3 competent assistance.  *Id.*

4 　　　　　Second, a defendant must affirmatively prove prejudice.  *Id.* at 693.  Prejudice is

5 found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

6 result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

7 probability sufficient to undermine confidence in the outcome."  *Id.*; *see also United States v.*

8 *Murray*, 751 F.2d 1528, 1535 (9th Cir. 1985).

9 　　　　　A court need not determine whether counsel's performance was deficient before

10 examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

11 *Strickland*, 466 U.S. 668, 697 (1984).  Since the defendant must affirmatively prove prejudice,

12 any deficiency that does not result in prejudice must necessarily fail.  However, there are certain

13 instances which are legally presumed to result in prejudice, e.g., where there has been an actual

14 or constructive denial of the assistance of counsel or where the State has interfered with

15 counsel's assistance.  *See Strickland*, 466 U.S. at 692.

16 　　　　　The Petitioner has not demonstrated that, had trial counsel objected to this

17 evidence, the outcome of the trial would have been different.  The evidence against the Petitioner

18 was clear and overwhelming.  Furthermore, Handy's testimony was not as pivotal to the state's

19 case as the Petitioner asserts.  During his testimony, Handy contradicted several statements that

20 he originally made to Detective Stokes about the events on the night in question.  For example,

21 Handy stated that he saw the Petitioner "moving around" in the car for "a couple of seconds"

22 instead of testifying that he saw the Petitioner "wiping down the steering wheel" as he had stated

23 to Detective Stokes.  RT at 1343-44.  While Handy testified that the Petitioner had an MOD

24 tattoo and he was considered to be a member of MOD, he also stated that the Petitioner was not

25 active in the gang during the summer of 1996 and "at no time [would the Petitioner] go out,

26 [and] shoot people to prove he's all hard."  *Id.* at 1329-30, 1351.  Handy's testimony did not

21

1

2   prejudice the Petitioner.  It may have, in some respects, actually aided the Petitioner's defense.

3      Moreover, as far as the bribery issue is concerned, the Court agrees with

4   Respondent that the "Petitioner [has] misinterpret[ed] the facts."  *See* Answer at 25.  On direct

5   examination, Handy testified that he was paid $300.00 to speak to the police academy.  RT at

6   1356.  Handy also stated, however, that his speech at the police academy was completely

7   unrelated to the Petitioner's trial.  *Id.* at 1525-28.  He testified that in his police academy

8   presentation, he merely answered questions about gangs.  *Id.*  The Petitioner has failed to

9   demonstrate that his counsel was ineffective in failing to object to this testimony.

10                                                **VIII**

11      Finally, the Petitioner argues that the cumulative effect of the above errors

12   deprived him of his due process rights and, therefore, requires a reversal of his conviction.

13   Petition at 47.  The principle of cumulative error is applicable where, "although no single trial

14   error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of

15   multiple errors may still prejudice a defendant."  *United States v. Frederick*, 78 F.3d 1370, 1381

16   (9th Cir. 1996); *see also Killian v. Poole*, 282 F.3d 1204, 1211 (9th Cir. 2002) ("For even if no

17   single error were prejudicial, where there are several substantial errors, 'their cumulative effect

18   may nevertheless be so prejudicial as to require reversal.'") (citation omitted).  However, where

19   there is no error, nothing can accumulate to the level of a constitutional violation.  The Petitioner

20   has failed to demonstrate any constitutional error.

21                                          CONCLUSION

22      IT IS HEREBY ORDERED that the Petitioner's application for habeas corpus

23   relief under § 2254 is denied.

24   DATED: February 05, 2008

25                                    /s/ Arthur Alarcón
                                      UNITED STATES CIRCUIT JUDGE
26                                    Sitting by Designation